(598 P.2d 1061)

No. 49,160

MARCIA A. TRAYLOR, *Appellee,* v. MILLARD A. WACHTER and EMCASCO INSURANCE COMPANY, *Appellants.*

Petition for review granted November 8, 1979.

Opinion filed August 3, 1979.

*David W. Kennedy* and *Jack H. Greene,* of Greene & Kennedy, of Wichita, for appellant Millard A. Wachter.

*Mark F. Anderson,* of Kidwell & Williamson, Chartered, and *Daniel C. Bachmann,* of Bachmann, Arnold & Graybill, both of Wichita, for appellant Emcasco Insurance Company.

*Gerald W. Scott,* of Matlack, Foote, Scott, Joseph & Wilkinson, P.A., of Wichita, for appellee.

Before ABBOTT, P.J., REES and SWINEHART, JJ.

REES, J.: On December 20, 1973, an intersection accident occurred in Wichita. It involved automobiles owned and driven by plaintiff and defendant Millard A. Wachter. Plaintiff brought this action by filing her petition alleging entitlement to recovery of damages from Wachter and his automobile liability insurer, defendant Emcasco Insurance Company. After a jury trial, judgments for actual and punitive damages were entered against the defendants. The defendants appeal.

On the afternoon of the day after the accident, plaintiff went to a local hospital. She was examined by an emergency room physi-

cian, given pain medication, instructed to see her personal physician, and released without having been admitted. She returned to her home, telephoned her physician, and made an appointment for January 2, 1974.

On December 26, 1973, a claims employee of the insurer contacted plaintiff by telephone. He advised her he represented Wachter's insurer. The insurer's records reflect that the claims man learned plaintiff was "having back problems and still under doctor's care"; and no estimate had yet been made of her car repair cost. Plaintiff testified this claims man told her to send to the insurer any medical bills she had and he suggested she take her car to Scholfield Bros. Pontiac, Inc., a local automobile dealership, for a repair estimate.

After inspecting the vehicle at Scholfield, Joe Brannon, another claims employee of defendant, spoke with plaintiff by telephone on December 27 or 28, seven or eight days after the accident. The evidence of what plaintiff and Brannon said to one another is conflicting and confusing. Without reiteration, their testimony is capable of three interpretations: (1) Nothing but repair of plaintiff's car was discussed. (2) It was then orally agreed that plaintiff released defendants from all claims of plaintiff arising out of the accident in consideration of the insurer's promise to pay the car repair cost and plaintiff's medical expenses incurred within one year of the accident but not to exceed $2,000. (3) Upon plaintiff's execution of a written release it would be agreed that plaintiff released defendants from all claims in consideration of the insurer's promise to pay the car repair cost and plaintiff's medical expenses incurred within one year of the accident but not to exceed $2,000.

On January 11, 1974, twenty-one days after the accident, plaintiff's car had been repaired. Brannon left with Scholfield for plaintiff's signature a draft in the amount of the repair cost as well as a written release by plaintiff of all claims reciting the consideration to be the insurer's promise to pay the car repair cost and reimbursement of medical expenses limited with regard to time and amount as mentioned. Plaintiff testified that when she spoke with Brannon on January 11, she was assured she would be settling her property damage claim only.

When plaintiff picked up her car from Scholfield that same day, she endorsed the draft. The written release was not presented for

her signature. At some unspecified time, obviously within the next few days, Cynthia Stark, a Scholfield office employee, came across the unsigned release. In putting together paperwork to send to the insurer, Stark signed plaintiff's name to the release. It was sent to the insurer and placed in plaintiff's claim file.

During 1974, plaintiff sent to the insurer various bills for medical expenses incurred. Drafts were issued for payment of these bills. The day of reckoning came in December, 1974, or January, 1975. When plaintiff asked for payment of a medical expense incurred more than a year after the accident, Brannon declined to pay telling plaintiff there was no obligation because of the written release resting in the insurer's file. In a conversation with Brannon in about January, 1975, plaintiff told him she had signed no release and she had a lawyer. She also asked for a copy of the release. Brannon declined saying that if her lawyer would contact him, the insurer would send a copy to the lawyer. The lawyer did by letter of February 21 and the insurer did with a transmittal letter dated five days later, February 26. Plaintiff's lawyer's letter said plaintiff had advised him she had not knowingly signed a release. The record reflects no further communication between plaintiff and the insurer and no activity by the insurer prior to service of suit papers on April 28, 1975, sixty-one days after the copy of the release was sent to plaintiff's lawyer. Thereafter, through investigation at Scholfield, the insurer learned of Stark's forgery.

According to the record, the pretrial conference was held on August 25, 1975. The pretrial conference order, approved by counsel for the parties and signed by the trial judge, was not filed until the first day of trial, nineteen months later. In that order, it was recited that plaintiff made two claims against the defendants.

The first claim was for compensatory damages for physical injury and property damage resulting from the automobile accident. On this first claim, plaintiff sought recovery from Wachter only. Plaintiff and Wachter each charged the other with certain violations of rules of the road.

The second claim was sort of a mixed bag claim in that a mingling of negligence, malice, fraud and outrage was alleged. This second claim was stated as follows:

"The plaintiff charges the defendants Wachter and Emcasco Insurance Company with the following negligent, malicious, fraudulent and outrageous actions by and through their agents and/or employees:

"A. Forgery of plaintiff's signature to a release by defendants' agents;

"B. Reliance upon forged release;

"C. Failure to make a good faith investigation of plaintiff's allegations of forgery prior to suit;

"D. Fraud in lack of explanation of effect of Agreement and Release document which defendant Emcasco's employee and defendant Wachter's agent knew contained elements and consequences not orally explained to claimants with the further expectation that claimants would rely on said explanations of defendants' employee and/or agent and execute said document;

"E. Attempted reliance on void general release;

"F. Attempting to negotiate a settlement with and/or obtain a general release from an injured person within fifteen (15) days of an occurrence causing injury with the knowledge that the injured person was under the care of a physician."

Although it appears that by way of answer and at trial the defendants claimed reliance upon an oral release by plaintiff made during the December 27 or 28, 1973, conversation, no affirmative defenses to plaintiff's second claim are stated in the pretrial order.

Three other observations concerning the pretrial order deserve mention. The sole issue identified for determination at trial was said to be whether employees of Scholfield were agents of plaintiff, defendants, or any of them, in the transactions concerning the repair of plaintiff's car and written release. There was no mention of punitive damages other than as may be arguably inherent in the quoted language of the order. There was no mention of questions of law to be decided in advance of or at trial.

Trial commenced the afternoon of Monday, March 21, 1977. Upon completion of the presentation of evidence, recess was taken at 3:00 p.m. on Thursday, March 24. The jury was directed to return the next morning. The plaintiff filed requested instructions. They are not in the record except as some may be among those given by the court. The record reflects no filing by the defendants of written requested instructions. We assume the jury returned as directed. It was not until that Friday night at 7:05 p.m. that court was reconvened before the jury. The jury was instructed. Closing arguments were made. The jurors informed the court they wanted to try to complete the case that night. The jury went to dinner, reassembled, deliberated and reported its verdicts at 1:20 a.m.

The jury delivered to the court a written statement of multiple general verdicts signed by the foreman. The verdicts form recited

$55,000 actual damages on plaintiff's first claim for automobile negligence against Wachter; no actual damages on plaintiff's second claim against either defendant; $50,000 punitive damages on plaintiff's second claim against Wachter; and $100,000 punitive damages on plaintiff's second claim against the insurer. No trial record was taken following closing arguments. We are told the jury was polled and discharged.

The briefs and record on appeal in this case have placed before us diffuse and kaleidoscopic issues and arguments. The arguments of the parties stand on shifting sands. Each party makes selective references to the evidence with frequent disregard of that party's own testimony.

Wachter first contends the trial court erred in denying his post-trial motion to amend, the recognized purpose of which was to correct the written verdicts to reflect what is claimed to have been the true verdicts of the jury. Wachter does not attack the actual damages verdict against him on plaintiff's first claim. Although within its other arguments the insurer attacks that verdict obliquely, Wachter's individual interests were separately represented by personal counsel at trial. Under the circumstances of this case, the insurer has no standing to challenge that verdict.

The events of post-trial contacts and communications between the jury and the court, counsel for Wachter, counsel for the insurer, and a representative of the insurer need not be detailed. In support of his motion to amend, Wachter presented the affidavits of nine of the jurors and the live testimony of the other three jurors. The twelve jurors unanimously stated that their true verdicts were that plaintiff recover $55,000 actual damages against Wachter on her first claim, plaintiff recover no damages against Wachter on her second claim, plaintiff recover $50,000 actual damages against the insurer on her second claim, and plaintiff recover $100,000 punitive damages against the insurer on her second claim. The jurors agreed their verdicts were mistakenly recorded on the verdicts form.

As the motion to amend was brought before and presented to the court, it was in the nature of a request by a party, Wachter, for a verdict correction and not a change sought by one or more jurors.

Without abandoning alternative arguments, plaintiff agrees with Wachter that judgments should have been entered, not

according to the verdicts form, but according to the true verdicts as established by the jurors' affidavits and testimony.

The trial court confirmed its entry of judgments in accord with the verdicts form. Change was declined on the ground the motion to amend and the presentation of the jurors' affidavits and testimony constituted an impermissible attempt to impeach the written jury verdicts. Understandably, the insurer supports this decision of the trial court. The requested change by way of correction would undercut the insurer's argument that the punitive damages judgment against it on plaintiff's second claim cannot stand in the absence of a judgment for actual damages.

We must first decide if the judgments should conform to the verdicts form or the uncontradicted post-judgment evidence. It is our decision that the judgments should conform to the latter.

In the instruction authorizing and defining punitive damages, Instruction No. 9, it was said that "[i]f . . . plaintiff proves she is entitled to actual damages, then in addition to the actual damages to which you find the plaintiff entitled, you may award plaintiff an additional amount as punitive damages."

In Instruction No. 1A concerning the statement of plaintiff's second claim, it was said "plaintiff seeks . . . $100,000 punitive damages." It was said in Instruction No. 29 that "the total amount of your punitive verdict on [plaintiff's second claim] may not exceed $100,000." These statements became the law of this case (*Iseman v. Kansas Gas & Electric Co.,* 222 Kan. 644, 649, 567 P.2d 856 [1977]) and, contrary to an observation of the trial court, they left no room for the jury to return punitive damages verdicts totaling $150,000.

The affidavits and testimony of the jurors disclose they were not confused, they did not misunderstand the instructions, and they did not disregard them. *Cf. Holt v. Frito-Lay, Inc.,* 217 Kan. 56, 62, 535 P.2d 450 (1975) [confused in answering special questions]; *Dicker v. Smith,* 215 Kan. 212, 217, 523 P.2d 371 (1974) [misunderstood or disregarded instructions]; *Hubbard v. Havlik,* 213 Kan. 594, Syl. ¶ 5, 518 P.2d 352 (1974) [disregarded instructions].

The verdicts form reflects results contrary to the instructions concerning plaintiff's second claim. By that form, there were punitive damages verdicts in the absence of the condition precedent, actual damages; there were punitive damages verdicts in a

total amount exceeding the $100,000 limit imposed by the instructions.

It is presumed that a jury will follow and has followed the instructions given to it. *McCarthy v. Tetyak,* 184 Kan. 126, 134, 334 P.2d 379 (1959); *Henderson v. Talbott,* 175 Kan. 615, 624, 266 P.2d 273 (1954). Correction of the verdicts and entry of judgments as sought harmonize the instructions and the verdicts. Such harmony is in full accord with the post-trial evidence of the jury's true verdicts.

We do not view the corrective relief sought by Wachter's motion to amend as an impermissible attempt to impeach the jury's verdicts. The thrust was not to examine the jury's mental processes; it was to effect an accurate report of the jury's true verdicts by correction of claimed error. See K.S.A. 60-260(*a*); K.S.A. 60-441; *Woodworkers Tool Works v. Byrne,* 191 F.2d 667, 676 (9th Cir. 1951); 11 Wright & Miller, Federal Practice and Procedure, Civil § 2854, pp. 152-153, n. 53; 18 A.L.R.3d 1132, §§ 3, 4; 76 Am.Jur.2d, Trial § 1226, pp. 179-180.

We are persuaded by what we believe to be the better reasoning reflected by the decisions representing the so-called greater weight of authority. Further, we find that K.S.A. 60-260(*a*) and K.S.A. 60-441 afford support for and do not negate this conclusion.

We are not persuaded by the insurer's argument that finality of verdicts and judgments forbids correction of clerical error in this case. No judgment is final until the time for filing and determination of post-judgment motions and appeals has expired. Wachter's motion to amend was timely filed under K.S.A. 60-259(*f*).

We hold Wachter's motion to amend should have been sustained and judgments should have been entered in accord with his request. This resolves Wachter's appeal. It eliminates the foundation of the insurer's argument that the punitive damages judgment against it cannot stand in the absence of an actual damages judgment and obviates discussion of plaintiff's related counter argument. Our further consideration of this case is premised on the existence of a $50,000 actual damages judgment and a $100,000 punitive damages judgment against the insurer on plaintiff's second claim.

There is intermingling of questions raised on appeal by the

insurer. Some are not directly expressed in the issues stated in its brief. We will endeavor to address the remaining questions as we understand them after first speaking to questions of agency and interpretation of K.S.A. 60-2801 *et seq.*

Substantial argument is made concerning whether the actions of Stark and other employees of Scholfield are imputable to the insurer, it being claimed by plaintiff that at all material times they were acting as agents of the insurer. Most directly involved is the conduct of Stark who, without having presented the document to plaintiff, signed plaintiff's name to the written release and thereafter caused it to be returned to the insurer.

We conclude the question of agency was one for the jury, not one determinable as a matter of law. What constitutes agency and whether there is competent evidence reasonably tending to prove the relationship is a question of law. It is our province to determine if the record reveals evidence on which a finding of agency could be based, not to decide whether, under proper instructions relating to the law of principal and agent, it existed as a matter of fact. *Thurman v. Cundiff*, 2 Kan. App. 2d 406, 411-412, 580 P.2d 893 (1978).

The only question of fact to be decided according to the pretrial order was whether Scholfield's employees acted as agents of one or both defendants, or of plaintiff, or of none of them. The jury instructions did not include an instruction defining agency, such as PIK Civ. 2d 7.01 (1978). When the trial court's proposed instructions were considered, no request was made for an instruction defining agency and no objection to the failure to give such an instruction has been lodged in the trial court, at trial or post-trial, or before us.

Instruction No. 23 given the jury is an appropriate adaptation of PIK Civ. 2d 7.06 (1978). It informed the jury that plaintiff claimed Scholfield's employees were agents of the defendants and acted within the scope of their agency; and that if the jury found Scholfield's employees were agents of the defendants acting within the scope of their authority, then their conduct was the conduct of defendants. This instruction called upon the jury to make two findings, *i.e.,* were Scholfield's employees agents of defendants and, if so, did they act within the scope of their authority.

Instruction No. 24 given to the jury is an appropriate adaptation

of PIK Civ. 2d 7.04 (1978). It informed the jury of the law to be applied in finding whether Scholfield's employees were acting within the scope of their authority as agents of defendants.

Under all the facts and circumstances reflected by the record, including some we have not summarized, we find ourselves unable to find as a matter of law that the insurer should be exonerated from the conduct of Stark insofar as her conduct may have been imputed to the insurer by the jury.

Considerable argument has been made at trial and on appeal concerning construction and application of K.S.A. 60-2801 and 60-2802. These two statutory sections were a 1972 legislative enactment reportedly made in response to complaints of so-called "hot boxing" and "rush releases." 41 J.B.A.K. 7, 60-61 (1972). The statutes read as follows:

60-2801. "(a) Within fifteen (15) days of the date of the occurrence causing injury to any person, who either is under the care of a person licensed to practice the healing arts, or is confined to a hospital or sanitarium as a patient, no person whose interest is or may become adverse to the injured person shall:

"(1) Negotiate or attempt to negotiate a settlement with the injured patient; or

"(2) obtain or attempt to obtain a general release of liability from the injured patient.

"(b) Any settlement agreement entered into, any general release of liability or any written statement made by any person who is under the care of a person licensed to practice the healing arts or is confined in a hospital or sanitarium after he or she incurs a personal injury, which is not obtained in accordance with the provisions of K.S.A. 60-2802, may be disavowed by the injured person within fifteen (15) days after discharge from the care of any person licensed to practice the healing arts or after release from the hospital or sanitarium, whichever occurs first, and such statement, release or settlement shall not be received in evidence in any court action relating to the injury."

60-2802. "The provisions of this act relating to settlements, releases and statements obtained from a patient confined in a hospital or sanitarium or being treated by a person licensed to practice the healing arts, shall not apply, if such patient is released from a hospital or sanitarium or released by a person licensed to practice the healing arts, within fifteen (15) days of the date of the occurrence causing injury, or if at least five (5) days prior to obtaining the settlement, release or statement, the injured party has signed in writing his or her willingness that a settlement, release or statement be given."

One of the "negligent, malicious, fraudulent and outrageous actions" alleged by plaintiff in her second claim was the attempt to negotiate a settlement and release within fifteen days after the accident while plaintiff was under doctor's care. The jury was so instructed. Additionally and over defense objection, verbatim quotation of K.S.A. 60-2801(a) was given as a jury instruction.

Plaintiff argues violation of K.S.A. 60-2801(*a*), standing alone, gives rise to a cause of action. The insurer says K.S.A. 60-2801 and 60-2802 must be read together and in their entirety and that there is but one remedy afforded here, that is, disavowal as provided by K.S.A. 60-2801(*b*), of any agreed settlement or release obtained. We believe both parties are mistaken.

In determining the legislative intent behind a particular statute, courts are not limited to a mere consideration of the language used, but look to the background of the enactment, the circumstances attending its passage, the purpose to be accomplished and the effect the statute may have under various constructions suggested. *Brown v. Keill,* 224 Kan. 195, Syl. ¶ 3, 200, 580 P.2d 867 (1978). In order to ascertain legislative intent, courts are not permitted to consider only a certain part of an act but are required to consider and construe together all parts therein *in pari materia.* When interpretation of one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the literal import of words or phrases which conflict with the manifest purpose of the legislature. *Brown v. Keill,* 224 Kan. 195, Syl. ¶ 4, 200.

K.S.A. 60-2801 and 60-2802 had their origin as a House bill, H.B. 2105. The version of H.B. 2105 reported out by the House Judiciary Committee was virtually identical to a 1971 New Mexico statute, N.M. Stat. Ann. § 41-1-1. See *Mitschelen v. State Farm Mut. Auto. Ins. Co.,* 89 N.M. 586, 555 P.2d 707 (1976). The House-passed version of H.B. 2105, as does the New Mexico statute, contained a provision making *any* settlement or release void unless acknowledged by a notary public. The Senate Judiciary Committee deleted this provision and the statute emerged after further amendment by the Senate Judiciary Committee and the entire Senate on third reading.

Other states have enacted similar statutes but have expressly provided settlements or releases obtained in contravention thereof to be void or voidable. Conn. Gen. Stat. Ann. § 52-572a (West) [voidable]; Md. Ann. Code art. 79, § 11 [voidable]; N. D. Cent. Code § 9-08-08 [voidable]; Mass. Gen. Laws Ann. ch. 271, § 44 (West) [null and void]; Me. Rev. Stat. tit. 17, § 3964 (1978-1979 Supp.) [null and void]; R. I. Gen. Laws § 9-19-12 [null and

void]. Other statutes, similar to those of Kansas and New Mexico, do not expressly provide that statutorily proscribed settlements and releases are void or voidable, but provide for disavowal. Vt. Stat. Ann. tit. 12, § 1076 [disavow within three years]; Idaho Code § 29-113 [disavow within one year]. We have found no New Mexico, Vermont or Idaho case law to aid us in interpretation of K.S.A. 60-2801 and 60-2802. The parties have provided none.

The literal import of K.S.A. 60-2801(*a*) is a flat prohibition against negotiating or attempting to negotiate a settlement or release with an injured person within fifteen days of the injury causing occurrence if the injured person is hospitalized or under doctor's care. K.S.A. 60-2801(*b*) provides as an additional part of the legislative scheme that *any* settlement agreement or release obtained from an injured person while hospitalized or under doctor's care, whether or not obtained within fifteen days of the injury causing occurrence, may be disavowed within fifteen days of the injured person's discharge from hospitalization or doctor's care. K.S.A. 60-2802 then provides that 60-2801 shall not apply if an injured person is discharged from hospitalization or doctor's care within fifteen days of the injury causing occurrence or if five days prior to obtaining the settlement agreement or release the injured party has signified in writing a willingness to negotiate.

Consideration of K.S.A. 60-2801 and 60-2802 together and as a whole leads us to conclude that where the facts render 60-2801(*b*) and 60-2802 inapplicable, a settlement or release obtained under circumstances in contravention of 60-2801(*a*) is void; no separate cause of action was intended for a violation of K.S.A. 60-2801(*a*). We believe this statutory construction is in accord with and effects the legislative purpose as we understand it to have been, that is, to afford a degree of protection from overreaching. Other construction and interpretation would lead to results we believe inconsistent with if not contrary to such purpose. We find it logical that a settlement or release obtained from an injured person, hospitalized or under doctor's care, within fifteen days of the injury causing occurrence (K.S.A. 60-2801[*a*]) should be void in view of K.S.A. 60-2801(*b*), which renders a settlement or release voidable by disavowal if it was obtained from an injured person, hospitalized or under doctor's care, after the first fifteen days following the injury causing occurrence.

The insurer's first specific argument is that the forgery of

plaintiff's signature to the written release was not the act of its agent. The writing of plaintiff's name upon the written release was admitted by Stark who testified concerning her actions. The release was left by Brannon with Scholfield for the purpose of submission to plaintiff for her signature and for subsequent return by Scholfield to the insurer. For whose business purpose this task was accepted by Scholfield, acting through its employees, strikes us as clearly a jury question likely answered adversely to the insurer's position.

The insurer's present arguments addressed to the elements of actual and apparent agency were not made to the trial court. The insurer orally requested the trial court give a "mirror image" instruction with regard to Instruction No. 23. There was no written requested instruction filed. See K.S.A. 60-251. Had a "mirror image" instruction been given, a finding in accord with it would not have disabled the jury from finding the insurer to also have been a principal. The insurer clearly and expressly disclaims any contention that plaintiff may have been bound by Stark's signing of the release. The only record objection to either Instruction No. 23 or Instruction No. 24 was that the question of agency was not a submissible issue and we have noted our decision to the contrary.

It is next asserted that the insurer did not knowingly rely upon the forged release. Without question Brannon relied upon the forged release when in about January, 1975, he informed plaintiff that none of her medical expenses incurred more than a year after the accident date would be paid by the insurer. That Brannon was not personally knowledgeable of the falsity of the signature to the release misses the point. The purported signature of plaintiff to the release was a forgery; Brannon relied on the forged release. The testimony of Brannon indisputedly discloses that the insurer made no inquiry concerning the authenticity of the release signature until April 29, 1975, the day after service of suit papers. Whether the insurer was chargeable with Stark's knowledge of the forgery was dependent upon determination of the agency question.

It is argued that plaintiff's second claim for relief sounded wholly in fraud. We do not take it upon ourselves to say in what the claim of "negligent, malicious, fraudulent and outrageous actions" sounded. The record reveals no effort at pretrial or trial to define or clarify the claim. We find it rather late now.

Assuming plaintiff's second claim to be a claim of fraud, the insurer argues with questionable logic that violation of K.S.A. 60-2801(*a*) does not amount to fraud for the reason that such a violation does not give rise to an actionable claim for relief, a cause of action. We have said the consequence of violation of the statute is to render an obtained settlement or release void. Under the pretrial order and unchallenged jury instruction quoting the claim verbatim, the alleged violation of the statute, standing alone, is not asserted to have been *the* fraudulent conduct; it is but one of the multiple particular acts said by plaintiff to constitute actionable wrongful conduct, plaintiff's second claim.

It is further said by the insurer that there was no fraud, thus no entitlement to recover on plaintiff's second claim, because there is missing the element of reliance. Specifically, it is said there was no reliance because plaintiff did not sign, let alone see, the written release. We are unpersuaded by the insurer's argument. It pleaded release as an affirmative defense; at the close of all the evidence, it argued there was an oral settlement agreement (when such an agreement was made escapes us); and it made no objection to Instruction No. 11 that defined actionable fraud or Instruction No. 10 that in part told the jury concealment or nondisclosure of material facts may constitute fraud. This argument of the insurer is inconsistent with its claim there was a release, necessarily involving action in reliance on representations or promises of the insurer, and in our view the absence of objection to the mentioned jury instructions made it the law of this case that it was for the jury to decide whether there was fraud. *Iseman v. Kansas Gas & Electric Co.,* 222 Kan. at 649; *State v. Collins,* 217 Kan. 418, 419, 536 P.2d 1382 (1975).

Not having done so through its designated issues on appeal or in its principal brief, the insurer, through a reply brief, undertakes to demonstrate the inapplicability of the tort of outrage to the facts of this case. Although we might hold such argument tardily made, we find that it cannot now be entertained because not only was no objection made to Instruction No. 19, which defined outrage, but also the issue was not raised in the trial court. *Safeway Stores, Inc. v. Workers' Compensation Fund,* 3 Kan. App. 2d 283, Syl. ¶ 1, 284, 593 P.2d 1009 (1979).

We conclude the insurer's divide and conquer attack upon

plaintiff's second claim, as made, must fail. Whether plaintiff's right to recover upon her second claim would be otherwise assailable, we neither speculate nor decide.

Relying upon *Ware v. State Farm Mutual Automobile Ins. Co.,* 181 Kan. 291, 311 P.2d 316 (1957), and similar case authority, the insurer argues that even though plaintiff might be found entitled to recover on one or the other of her two claims, she cannot recover on both. As alleged and prosecuted, the proceedings here involved did not require an election of remedies. Plaintiff's first claim was for physical injury and property damage arising out of the automobile accident. Her second claim was for damages resulting from the activities and conduct of the insurer's employees, as well as its other purported agents, after the accident and in regard to negotiations for settlement of plaintiff's accident claims. Plaintiff denied the existence of a settlement agreement. Had she acknowledged the existence of a settlement agreement but claimed her assent thereto was wrongfully obtained, we would have a *Ware* situation. The principle of *Ware* is not applicable.

The trial court gave thirty-seven instructions. The insurer argues to us that seventeen of the instructions were erroneously given but disregards the fact ten of these were not objected to at trial. Review of the ten previously unchallenged instructions is limited to whether they are clearly erroneous. K.S.A. 60-251(*b*); *Coleman v. Brotherhood State Bank,* 3 Kan. App. 2d 162, Syl. ¶ 2, 166, 592 P.2d 103 (1979). We find none are clearly erroneous.

An erroneous jury instruction which does not prejudice the substantial rights of the defendant does not afford a sound basis for reversal of a judgment. *Patterson v. Burt,* 213 Kan. 463, 467, 516 P.2d 975 (1973).

"The determination whether the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal depends upon all the circumstances of the case, including a consideration of all the evidence. No precise formula can be drawn." *Curby v. Ulysses Irrigation Pipe Co., Inc.,* 204 Kan. 456, 462, 464 P.2d 245 (1970).

Instruction No. 2G advised that a forged release or a statutorily prohibited release is void. The insurer's trial objection was that it never contended the written release was anything but void; that inclusion of reference to a statutorily prohibited release misstates the law of K.S.A. 60-2801 and 60-2802. We have discussed the

statutes. Although the jury might have been better instructed if counsel and the trial court had had the benefit of appellate statutory construction, we do not find the instruction to be a legal misstatement or prejudicial to the insurer's rights.

Instruction 2H addressed itself to the meaning of the words "under the care of a physician authorized to practice the healing arts" and read as follows:

"The words 'under the care of a physician authorized to practice the healing arts' are not words of art but have the meaning understood by man in everyday usage of the words.

"It would include a person who is taking medication prescribed by a physician, following instructions given by a physician or awaiting an appointment with a physician."

Objection was to only the second paragraph of the instruction and, in all honesty, we find the objection made at trial incomprehensible. It appears in the record as follows:

"[W]ith respect to the second paragraph we don't believe that that correctly states the law that there is no authorization. We're suggesting that simply anybody that takes medication following instructions or who is waiting appointment is a person under the care of a physician authorized to practice the healing arts."

The insurer proposed no instruction defining the statutory phrase. Perhaps none is needed or should be given. Its argument on appeal, that the second paragraph specifically fits plaintiff's situation took away from the jury a factual question properly determinable by it, was not made to the trial court.

Instruction No. 9 advised the jury of the grounds for and measure of punitive damages. The complaints at trial were that the word "wanton" should have been deleted and PIK Civ. 2d 9.44 (1978) should have been given. We find no material variance from PIK Civ. 2d 9.44 (1978) and no error, at least not reversible error, in inclusion of the word "wanton." The insurer's appellate criticism is bottomed on its argument that the case should not have gone to the jury so as to allow recovery for fraud and that plaintiff's second claim sounded wholly in fraud. In light of our previously expressed views, we are unable to find the urged reversible error.

Instruction No. 22, as we have said, was a verbatim recitation of K.S.A. 60-2801(a). It necessarily is read in conjunction with Instruction No. 2G. As so read, the jury was effectively instructed that a release obtained in contravention of K.S.A. 60-2801(a) is

void, a conclusion we have reached, and the giving of the instruction was not erroneous. Henceforth, the subject may be substantially better dealt with.

Instructions 23 and 24 were and are challenged on the premise that Scholfield's employees were not the insurer's agents, a question we have determined to have been for the jury.

Instruction No. 26 was a verbatim quotation of K.S.A. 40-275, dealing with advance or partial payments, together with the statement that the court would make any statutorily required adjustment. We see no reason for the instruction, but with its inclusion of the added statement concerning adjustment by the court, it clearly was not prejudicial.

The insurer has failed to satisfy its burden to establish to our satisfaction the existence of reversible error in the instructions. We find the record discloses competent evidence, much of which is not summarized in this opinion, to support an award of substantial, not nominal, actual damages as a result of the insured's actions complained of in plaintiff's second claim. We also find in the summarized and unsummarized evidence, evidence of sufficient quality and quantity to support an award of punitive damages on that claim.

There is complaint made that the jury verdicts were the product of jury passion and prejudice. Eight circumstances relating to the trial proceedings are called to our attention and referred to as illustrative of the pressures under which the jury was forced to labor. Two of these are a rehash of issues of law with which we have already dealt. The other six are not shown to be causally related to the verdicts except as we might speculate, which we decline to do.

The remaining passion and prejudice argument is founded solely upon the size of the verdicts, separately and in total. Neither in the trial court nor before us has the insurer sought an order of remittitur. Following trial, the insurer asked for relief from the judgments but expressed neither a ground for such relief nor a statement of the nature of relief sought. We have said:

"Where the charge of excessive verdict is based on passion or prejudice of the jury and depends for support solely upon the size of the verdict, the trial court will not be reversed for refusing a new trial, nor will a remittitur be ordered unless the amount of the verdict in the light of the evidence shocks the conscience of the appellate court." *George v. Bolen-Williams, Realtors,* 2 Kan. App. 2d 385, 394, 580 P.2d 1357 (1978).

The verdicts were sizeable but our collective conscience is not shocked.

The judgment against Wachter for actual damages in the amount of $55,000 is affirmed. The judgment against defendant Wachter for punitive damages in the amount of $50,000 is reversed and vacated. The judgment against Emcasco Insurance Company for punitive damages in the amount of $100,000 is affirmed. The case is remanded with directions to enter judgment against defendant Emcasco Insurance Company for actual damages in the amount of $50,000.