NOT DESIGNATED FOR PUBLICATION

No. 121,912

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

BETH JANICE MERRILL,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed August 28, 2020. Reversed and remanded.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Thomas J. Bath, Jr.*, of Bath & Edmonds, P.A., of Overland Park, for appellee.

Before MALONE, P.J., MCANANY, S.J., and BURGESS, S.J.

PER CURIAM: In this interlocutory appeal by the State we consider whether the district court erred in suppressing Beth Merrill's blood test results in a felony aggravated driving under the influence (DUI) case. We conclude that the district court erred in doing so and remand to the district court for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

At about 11 in the morning on November 18, 2016, Leawood Police Department Officer Coby Shields responded to the report of an automobile accident. Eyewitnesses

1

told Shields that Merrill had been driving erratically as she approached the intersection. They reported that Merrill failed to stop or slow down for the red light and rear-ended two vehicles stopped at the intersection. Two elderly passengers in one of the vehicles Merrill rear-ended sustained serious injuries and were transported to the hospital. One of the witnesses reported that after the crash he could smell alcohol on Merrill.

Officer Shields spoke to Merrill, whose breath had a heavy odor of alcohol. As she spoke, Merrill slurred her words. She kept trying to let her dog out of its kennel in the back seat of her car after Shields repeatedly told her to leave the dog in the kennel. Shields repeatedly asked Merrill for her driver's license, which she was unable to provide while insisting all the while that she had already given it to him. She had a difficult time maintaining her balance as she walked and had to use Shields for support. She unsuccessfully performed and failed to complete the field sobriety tests. Merrill admitted that she had been drinking, but she refused to take a preliminary breath test. She was arrested and transported to the Leawood police station.

At the police station, Officer Shields escorted Merrill to an interview room. Merrill kept asking Shields who he was and repeatedly demanded to get her dog back. Shields began reading to Merrill the implied consent advisory while Merrill spoke over him, repeatedly asking about her dog and calling for it. Shields asked Merrill if she was listening to him and if she understood what he was telling her. Merrill responded that she did not "understand shit" and that she wanted her dog back. Shields continued reading the advisory aloud to her while Merrill kept demanding her dog back.

Merrill refused to submit to a breathalyzer test, stating she would not take the test because she wanted her dog. Merrill was placed in a holding cell while Shields began the process of requesting a search warrant for a sample of Merrill's blood to be tested.

While Shields worked on obtaining the search warrant, another officer completed Merrill's booking process. During that process and later there at the police station, both before and after Merrill's blood draw at the hospital, Merrill was asked questions about the accident though she had not been apprised of her *Miranda* rights. She asked for an attorney on several occasions but was not given the opportunity to contact one.

The district court ultimately suppressed her responses to police questioning, and the propriety of that ruling is not the subject of this appeal. In fact, the State prior to the ruling on a suppression motion stated it would not use at trial any statements Merrill made while in police custody. For these reasons, we will not detail the facts related to those *Miranda* violations by the police. We will focus on the events that occurred when Merrill was taken to the hospital for a blood draw. Those are the events that are the subject of this appeal.

Returning to our narrative, Officer Shields informed Merrill that they would be taking her to the hospital to have her blood drawn as authorized by the search warrant. Once the warrant was in hand, Officers Shields and Mark Teerink transported Merrill to Menorah Medical Center for the blood draw.

Officer Shields spoke with Caitlin Hargas, a paramedic who was working at the hospital reception desk. He told Hargas that he had a warrant to obtain a blood sample from Merrill and that Merrill had been involved in an injury accident. An unknown member of the medical staff escorted the officers and Merrill into an area with several open beds, and Merrill was directed to one of the beds. Officers Shields and Teerink remained close to Merrill and recorded the various interactions with their body cameras. The medical staff member told Merrill she would be taking Merrill's vitals, and Merrill had difficulty complying with the staff member's requests. Officer Teerink explained to Merrill that they had a search warrant to obtain a blood sample from her and she needed to cooperate if she wanted to get her dog back.

3

At that point, Angela Reffitt, a nurse practitioner at Menorah, introduced herself to Merrill and began questioning Merrill. She asked Merrill if she had been involved in an auto accident, if she had her seatbelt on, how fast she had been going, whether the airbags had been deployed, and whether she remembered the airbags deploying. Merrill told Reffitt to stop asking her questions. Officer Teerink told Merrill to cooperate. He later testified that he "just wanted to get that process over with so [he] could get out of there."

Reffitt asked Merrill about her medical history, whether she suffered any injuries, how much she had to drink that morning, what time she started drinking, and whether she was on any prescription or illegal substances. Merrill responded that she drank a bottle of wine and had taken three prescription Xanax that morning. Teerink included this reference to the bottle of wine and prescription Xanax in his report.

Paramedic Hargas began to administer the blood draw, but she was unable to complete the procedure because Merrill contaminated the site by blowing on it. Hargas eventually was successful in administering the blood draw. The officers then transported Merrill back to the police station where she was released from custody and picked up by a family friend. The testing of Merrill's blood sample disclosed that she had a blood alcohol content of 0.31 grams per 100 milliliters of blood—almost four times the legal limit.

The State charged Merrill with two counts of DUI aggravated battery, level 5 person felonies, and a misdemeanor refusal of a preliminary breath test. Merrill responded with a series of motions, including motions to suppress her pre-*Miranda* statements, to dismiss the case or disqualify the prosecutors and police officers involved in the case, and to suppress her blood test results. The court took up these motions at a series of hearings.

4

Reffitt testified at one of the hearings on Merrill's motions. Reffitt testified that while she had no independent recollection of meeting with Merrill, she explained the medical screening procedures she follows for patients like Merrill regardless of whether they are accompanied by law enforcement. In every case she would approach the patient, evaluate the patient's physical and mental well-being, determine what type of medical evaluation might be needed, and decide what further testing or examination would be necessary, if any. If she believed a patient to be intoxicated, she would also ask the patient questions about how much alcohol and what prescription or illegal substances the patient had consumed in order to establish whether the patient would be able to answer screening questions. These screening questions were necessary for potential treatment purposes, and she would ask them regardless of whether police officers were present. When a police officer was present her practice was to not run her questions by the police before asking the patient. When asked whether she recalled being ordered by the officers to ask Merrill any specific questions, she responded: "No, that's not part of my practice."

Reffitt stated that one of her roles as a nurse practitioner was to determine why a patient came to the emergency room. She understood that Merrill was there because she had been involved in an auto accident and that Merrill had been brought there by police officers. She came to understand that Merrill was there "about the blood draw but that wasn't my focus as to why I was seeing her." Reffitt conducted a screening like she normally would. She usually did not see individuals who had a warrant for a blood draw but performed a medical screening when she did. In any event, as a nurse practitioner she did not assist the police who came in with warrants.

At a continued hearing on Merrill's motions, the State informed the court it would not use at trial any of the statements elicited during Merrill's interaction with Reffitt. Officer Teerink then testified regarding Reffitt's questioning of Merrill. He conceded that Merrill's questions had nothing to do with the blood draw, but he understood them to be standard questions to determine if Merrill was medically clear. He had seen medical staff

5

perform screenings like this before. He did not direct Reffitt to ask Merrill any questions. He simply told Merrill to cooperate and answer Reffitt's questions because they needed to get the blood drawn. He included in his report information about Merrill's consumption of alcohol and prescription pills that day.

In addition to seeking suppression of her statements, Merrill moved to suppress the results of her blood draw, arguing that Officers Shields and Teerink exceeded the narrow scope of the search warrant. She did not argue that the warrant was invalid or defective in any way. Her argument was that the officers failed to *Mirandize* her, that they repeatedly denied her requests for an attorney, that Nurse Practitioner Reffitt was an agent of the officers because they allowed her to ask incriminating questions of Merrill in their presence, and that they used her responses against her. Merrill further claimed that the only viable remedy for these alleged violations was to suppress the blood test results.

At the hearing that followed, the State argued that because of its earlier statement that it would not use at trial any of Merrill's statements to Reffitt, the motion to suppress was moot. But the district court stated it wanted to hear additional evidence because it knew that Merrill was seeking sanctions for the various alleged *Miranda* violations.

With that, Officer Shields testified that he did not specifically recall Reffitt questioning Merrill about the accident. But he had previously seen medical staff question patients before administering blood draws in order to assess their medical condition. (We note here the provision in K.S.A. 2016 Supp. 8-1001(e), "[t]he medical professional shall withdraw the sample . . . provided the collection of the sample does not . . . seriously impede the person's medical assessment, care or treatment.")

In any event, Shields did not direct Reffitt to ask any questions of Merrill, and he did not include in his report any statements Merrill may have made to Reffitt because he did not think they would be used against Merrill.

6

At the next hearing, Paramedic Hargas testified that she checked Merrill in for a blood draw, not a medical screening, and she then performed the blood draw. She did not ask Merrill any questions.

Before the final hearing on the motions, the State modified its earlier position and informed the court that it would not use at trial any statements Merrill made to anyone at any time while she was in custody.

With respect to evidence of the blood draw results, Merrill argued to the district court that the officers were only allowed to obtain a blood sample and instead they let hospital staff improperly question her after the officers repeatedly denied her requests for an attorney and failed to *Mirandize* her. She argued that the officers then used that information against her to file charges and in setting her bond. She asked the court (1) to suppress the blood test results; or (2) to dismiss the case; or, at least, (3) to disqualify the prosecutors and the police officers involved.

The district court ordered that Merrill's statements be suppressed because she had been interrogated without having her attorney present. The court denied Merrill's motion to dismiss or to disqualify the prosecutors and police officers involved, stating that the violations did not rise to the level warranting dismissal or requiring disqualification.

With respect to  suppression of the blood test results, the focus of our present appeal, the court found that Reffitt acted as an agent of the police when she questioned Merrill at the hospital; that the information Reffitt sought to obtain was beyond the scope of the search warrant; and that the police used that information against Merrill. In allowing Reffitt to interrogate Merrill in the way she did, the police acted with flagrant disregard of the terms of the search warrant and turned it into an impermissible general

7

search. The court ruled that the appropriate remedy was suppression of the blood draw results and granted Merrill's motion to suppress the blood test results.

The State's interlocutory appeal brings the matter to us.

ANALYSIS

*Jurisdiction*

Merrill argues that the district court's rulings have not substantially impaired the State's ability to prosecute this action; thus, the State has no authority to pursue this interlocutory appeal. She contends that the State has plenty of evidence of her driving erratically before the crash, the evidence of the crash, and the officer's observations of Merrill at the accident scene.

The State argues that the blood sample evidence is the best evidence to prove the DUI charges against Merrill because such evidence would establish a per se statutory violation.

Whether jurisdiction exists is a question of law over which our scope of review is unlimited. *State v. Mburu*, 51 Kan. App. 2d 266, 269, 346 P.3d 1086 (2015).

The State's authority to appeal an order suppressing evidence in a criminal case is found in K.S.A. 2019 Supp. 22-3603, which provides that when the district court suppresses evidence, "an appeal may be taken by the prosecution from such order." But when challenged, the State must show how the district court's ruling substantially impairs the State's ability to prosecute the case. *State v. Newman*, 235 Kan. 29, 35, 680 P.2d 257 (1984). To show substantial impairment, the court on appeal must assess how important

8

the disputed evidence is to the State's ability to make out a prima facie case. *State v. Sales*, 290 Kan. 130, 140, 224 P.3d 546 (2010).

In *State v. Huninghake*, 238 Kan. 155, 708 P.2d 529 (1985), the district court suppressed the results of a blood alcohol test which showed that the defendant was legally intoxicated. Without the test results which apparently showed a blood alcohol level over 0.08, the State's only evidence was that the defendant was driving fast, refused to stop, had to be forced off the road, had the odor of alcohol on his breath, and had difficulty maintaining his balance. Our Supreme Court held that suppressing the test results deprived the State of the statutory presumption that Huninghake was driving under the influence under K.S.A. 8-1005(b). Accordingly, the court had jurisdiction to consider the State's interlocutory appeal. 238 Kan. at 157.

We find *Huninghake* to be applicable and persuasive. We conclude that we have jurisdiction over the State's interlocutory appeal.

*Suppression of the Blood Test Results*

The State argues on appeal that the district court erred in suppressing the results of Merrill's blood test. The legal conclusion that evidence should be suppressed is an issue of law over which we have unlimited review. *State v. Thurber*, 308 Kan. 140, 153, 420 P.3d 389 (2018).

*—Nurse Practitioner Reffitt's Status During the Custodial Interrogation*

The State asserts that Reffitt was not an agent of the police acting at their direction but rather acted independently and followed proper medical procedures and Kansas law in order to insure Merrill's safety before the blood draw was administered.

9

There is no dispute that Merrill was in custody at the time she was questioned by Reffitt at the hospital. The issue is whether Reffitt was an agent of the police when she questioned Merrill or whether she had some different relationship with the police.

Our standard of review has been described in *Traylor v. Wachter*, 3 Kan. App. 2d 536, Syl. ¶ 2, 598 P.2d 1061 (1979):

> "What constitutes agency and whether there is competent evidence tending to prove the relationship is a question of law. The province of an appellate court is to determine if the record reveals evidence on which a finding of agency could be based, not to decide whether, under proper instructions relating to the law of principal and agent, it existed as a matter of fact."

In considering Reffitt's relationship with the Leawood police, the district court made the following findings:

> "Nurse Reffitt[]was acting at the request of law enforcement in this process. The defendant would have never been . . . at the hospital unless . . . law enforcement had first sought a search warrant and a judge found probable cause to go and search for blood and the blood was the specific purpose for the officers to take the defendant to the hospital . . . .
>
>  . . . .
>
> "So, in this case, the defendant is in this place in front of these people for the sole purpose of a blood draw and Nurse Reffitt asked questions about the consumption of alcohol.
>
> ". . . Nurse Reffitt takes blood pressure, is obtaining all kinds of medical information from the defendant without her consent. She takes vital signs. Nurse Reffitt acted as the agent of law enforcement in obtaining possibly incriminating evidence outside the scope of the specific warrant that the Court issued for blood and the Court will find that Nurse Reffitt's collection of this evidence was not a *de minimis* event and exceeded the specific scope of the search warrant . . . .
>
>  . . . .

"Nurse [Hargas] did her job, took the blood. The whole violation this Court is
finding is the whole interaction between Nurse Reffitt with regard to the questions about
how much she had to drink, the blood pressure, the vital signs, all of those sorts of things
that were taken outside the scope of the blood draw."

With respect to the district court's finding that "Nurse Reffitt, was acting at the
request of law enforcement in this process," our task is to consider whether this assertion
is supported by substantial competent evidence and whether, if this assertion is supported
by the evidence, it creates an agency relationship between Reffitt and the police. We first
turn to the definition of agency stated in *Barbara Oil Co. v. Kansas Gas Supply Corp.*,
250 Kan. 438, Syl. ¶ 4, 827 P.2d 24 (1992):

"Agency has been defined as a contract, either express or implied, by which one
of the parties confides to the other the management of some business to be transacted in
the party's name or on the party's account and by which that other assumes to do the
business and to render an account of it."

A species of the generic notion of agency is the master/servant relationship which
is often discussed in analyzing employment situations. *Home Design, Inc. v. Kansas
Dept. of Human Resources*, 27 Kan. App. 2d 242, 2 P.3d 789 (2000). As found in *Home
Design*, and described in *AT&T Co. v. Winback and Conserve Program Inc.*, 42 F.3d
1421, 1435 (3d Cir. 1994), *cert. denied* 514 U.S. 1103 (1995), If the employer assumes
the right to control the time, manner, and method of accomplishing the work, versus the
right merely to require certain definite results in conformity with a contract, a
master/servant relationship exists. This concept was concisely stated in *Evans v. Board of
Ed. of Hays*, 178 Kan. 275, Syl. ¶¶ 3-4, 284 P.2d 1068 (1955):

"A master is a principal who employs another to perform service in his affairs
and who controls or has the right to control the physical conduct of the other in the
performance of the service.

11

"A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master."

1 Restatement (Third) of Agency § 1.01, Comment *f* (2005) states: "An essential element of agency is the principal's right to control the agent's actions." See *Hollingsworth v. Perry*, 570 U.S. 693, 713, 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013).

It is well settled that "'the acts of the agent (within the scope or apparent scope of his authority) are binding upon the principal.'" *Cross v. Aubel*, 154 Kan. 507, 510-11, 119 P.2d 490 (1941). The principal's liability for the agent's acts traditionally has been predicated upon the principal's right to control the agent's actions. "[L]iability is grounded upon the doctrine of respondeat superior. The power and control which the principal has over the agent is the primary factor to be considered." *Hughes v. Jones*, 206 Kan. 82, 87-88, 476 P.2d 588 (1970).

Standing in contrast to an agency relationship, an independent contractor has been defined in *Olds-Carter v. Lakeshore Farms, Inc.*, 45 Kan. App. 2d 390, Syl. ¶ 5, 250 P.3d 825 (2011), as follows:

"Kansas courts have consistently defined an independent contractor as one who, in exercising an independent employment, contracts to do certain work according to his or her own methods, without being subject to the control of the party he or she contracts with, except as to the results or product of his or her own work."

See *Evans*, 178 Kan. 275, Syl. ¶ 2.

Liability for the acts of an independent contractor is described in *Falls v. Scott*, 249 Kan. 54, Syl. ¶ 2, 815 P.2d 1104 (1991):

"As a general rule, when a person (a contractee) lets out work to another and reserves no control over the work or workmen, the relation of contractee and independent contractor exists, and not that of master and servant, and the contractee is not liable for the negligence or improper execution of the work by the independent contractor."

A case having analogous facts to those before us is *State v. Pursley*, 238 Kan. 253, 710 P.2d 1231 (1985). There, Pursley was arrested in connection with a murder investigation. Eddie Dean, a friend of Pursley's, was also a friend of the sheriff. Dean went to the station where Pursley was being held in order to speak with him. Dean was given permission to do so. The sheriff did not ask Dean to speak to Pursley on behalf of the authorities. Pursley spoke with Dean alone in his cell and eventually confessed to Dean that he committed the murder. Dean urged Pursley to confess to the police, which Pursley later did. Pursley moved to suppress his confession on the grounds that Dean was acting as an agent of police and interrogated him in violation of his *Miranda* rights. On appeal, the Kansas Supreme Court stated:

"In order to have established the existence of an agency relationship, the defendant would had to have shown that the officers intended Dean to act on their behalf, and also that Dean intended to accept the authority delegated to him. See *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980). The United States Supreme Court has found an agency relationship existed when a fellow inmate of the accused was a paid government informant, *United States v. Henry*, 447 U.S. 264, and when a psychiatrist was court-appointed. *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981).

"The United States Court of Appeals for the Seventh Circuit recently determined that an accused's older brother, whom police had placed in the accused's jail cell with the knowledge that the brother planned to talk the defendant into confessing, was not an 'agent of law enforcement' and, therefore, the resulting confession was not the product of a custodial interrogation. *United States ex rel. Church v. De Robertis,* 771 F.2d 1015 (7th Cir.1985)." *Pursley*, 238 Kan. at 261.

13

Our Supreme Court determined that Dean was not acting as an agent of law enforcement because the record showed that he spoke with the defendant on his own initiative, the police did not plant in Dean's mind the notion to persuade the defendant to confess, and the police did not initiate the meeting between Dean and the defendant. 238 Kan. at 261-62.

Applying these principles to the facts before us, we find no substantial competent evidence to support the proposition that Reffitt was acting as an agent of the Leawood police.

There is no indication that Reffitt had any contact or communication with the police before Merrill and the police arrived at the hospital that day. Reffitt was an employee of the hospital acting on behalf of her employer in her screening activity, not as an agent of the police in their effort to collect incriminating evidence from Merrill.

When Merrill and the police arrived at the hospital, Reffitt did not have any contact with her until after Merrill was placed in a bed and her vital signs were taken.

When Reffitt entered the room she identified herself by name and said she was the nurse practitioner who would be taking care of Merrill. There is nothing in the record to suggest that Reffitt's participation was prompted or orchestrated by the police.

Reffitt then asked Merrill whether she had been in an accident, whether she was wearing a seatbelt, and if her airbag deployed. It is apparent that when Merrill resisted answering, Teering's urging her to cooperate was to get on with the process and get it done. Teering's uncontradicted testimony was that he "just

14

wanted to get that process over with so [he] could get out of there." He did not prompt or encourage Reffitt in her questioning.

Reffitt then asked if Merrill knew where she was and then questioned her about consuming alcohol or drugs that day—questions consistent with determining whether a patient is sufficiently oriented and aware of her circumstances. This concluded Reffitt's involvement in the matter. Hargas took over and performed the blood draw.

Reffitt later testified that she had no independent recollection of the matter, but that her standard practice was to evaluate new patients, regardless of whether they were accompanied by the police, to see what type of further medical examination, evaluation, or testing might be needed. When a new patient appeared to be intoxicated like Merrill, she would also ask how much alcohol they had consumed and what prescription or illegal substances they might be on to establish whether the patient would be able to answer her screening questions. If the patient was accompanied by a police officer, she would not run her questions by the officer before asking the patient. When asked whether she recalled being ordered by the officers to ask Merrill any specific questions, she responded, "No, that's not part of my practice."

In advance of her testimony, Reffitt had an opportunity to view the police video of the events at the hospital. Viewing the video, Reffitt understood that Merrill was at the hospital because she had been involved in an auto accident. She came to understand that Merrill was there "about the blood draw but that wasn't my focus as to why I was seeing her." Reffitt conducted her screening just like she normally would.

Merrill was at the hospital because K.S.A. 2016 Supp. 8-1001(e) authorized the police to obtain from a medical professional a sample of her blood for testing. In

15

obtaining the blood sample for the police, the hospital staff, including Reffitt, were employees of the hospital and not agents of the police.

The police and Reffitt were operating in parallel, not converging, universes. The police wanted to collect evidence that a crime had been committed. Reffitt wanted to collect information to evaluate whether the patient needed treatment. It appears that Reffitt failed to recognize or to appreciate that Merrill was in that subset of persons arriving at the hospital who are not seeking medical treatment so as to invoke the routine screening protocols she employed when dealing with a newly admitted patient. Rather, it appears that her rote routine took over. (We interrupt to recall the statutory permission K.S.A. 2016 Supp. 8-1001[e] gives medical professionals in these situations to inquire of a person like Merrill about things that might affect the safety of a blood draw.) In any event, Reffitt's independent actions do not make her an agent of the police. She did not run her questions by the police before asking them of Merrill. The police did not tell her what questions to ask. The police did not orchestrate the situation or Reffitt's questioning. She was not beholden to the police in any way.

*Vis-à-vis* the police, Reffitt could, at most, be characterized as an independent contractor; i.e., as described in *Olds-Carter*, "one who, in exercising an independent employment, contracts to do certain work according to his or her own methods, without being subject to the control of the party he or she contracts with, except as to the results or product of his or her own work." 45 Kan. App. 2d at 401.

The authority given in K.S.A. 2016 Supp. 8-1001(e) did not give the police the power to direct the manner in which the task of drawing a blood sample was performed, nor did they attempt to do so. As an independent contractor, Reffitt's actions, if considered improper or beyond the scope of K.S.A. 2016 Supp. 8-1001(e), are not attributable to the police under the doctrine of *respondeat superior*, any more than the police would be liable for Reffitt's actions if Merrill had suffered injury due to Reffitt's

16

malpractice. Reffitt spoke with Merrill on her own initiative. The police did not plant in her mind the notion to persuade Merrill to incriminate herself.

The facts from the record cited by the district court to support its finding that Reffitt was an agent of the police are insufficient to support any such finding. Moreover, our review of the record fails to disclose substantial evidence that would support a finding that Reffitt was an agent of the police in her questioning of Merrill.

*Suppression of Blood Test Results Evidence as a Remedy for* Miranda *Violations*

The State challenges the bases for the district court's suppression of the results of Merrill's blood test. The district court suppressed these test results on these bases:

● The police violated Merrill's right to counsel.

● Suppression was appropriate because nurse practitioner Reffitt improperly questioned Merrill in the presence of the police officers.

● Reffitt was an agent of the police. By allowing her to interrogate Merrill as she did, the police acted with flagrant disregard of the terms of the search warrant and turned it into an impermissible general search.

We will address these bases in order.

*—Police Violation of Merrill's* Miranda *Rights*

Merrill begins her appellate argument on this issue as follows: "The court's decision to suppress all evidence seized in connection with the execution of the search warrant began with its finding that police had violated Ms. Merrill's right to counsel."

The State has not challenged on appeal the district court's finding that the Leawood police officers violated Merrill's *Miranda* rights. The issue here is the appropriateness of the remedy.

The United States Supreme Court has concluded—and the Kansas Supreme Court has recognized—that the only remedy a defendant is entitled to for a *Miranda* violation is to suppress any statements that were elicited as a result of that violation. Aside from the suppression of Merrill's un-*Mirandized* statements, suppression of physical evidence is not an appropriate remedy, even if her statements led to the evidence's discovery. See *United States v. Patane*, 542 U.S. 630, 636-44, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004) (plurality opinion); *State v. Schultz*, 289 Kan. 334, 347, 212 P.3d 150 (2009) (quoting *Patane*). In *Patane*, the United States Supreme Court specifically rejected application of the exclusionary rule—often applied when there is a Fourth Amendment violation—to Fifth Amendment violations for law enforcement officers' failure to provide *Miranda* warnings. *Patane*, 542 U.S. at 633-34, 644.

The district court had already suppressed Merrill's incriminating statements because of the State's Fifth Amendment violation. The State's *Miranda* violations were not a proper basis for suppressing Merrill's blood test results obtained in the course of a Fourth Amendment search. The district court erred in using the State's Fifth Amendment violations as a basis for suppressing Merrill's blood test results.

*—Reffitt Questioning Merrill in the Presence of the Police*

The district court suppressed Merrill's blood test results because, among other things, Reffitt questioned Merrill in the presence of the police officers. To the extent that Reffitt's questions were found to be improper, Reffitt was not an agent of the State when she asked them, so her conduct is not attributable to the State. To the extent that Reffitt's

18

screening of Merrill was appropriate, the better practice would have been for her to ask the police officers to step out of the room while she questioned Merrill. But there is no evidence that either Reffitt or the police intentionally set up the scene so that the police would be able to listen in on the questioning. If we consider this issue from the perspective of the police—i.e., whether they should not have been listening in on Reffitt's questioning—the State has already been sanctioned for the police participation by suppressing all of Merrill's statements made in response to Reffitt's questions while Merrill was in custody, and the State has not appealed that ruling.

— *Flagrant Disregard of the Terms of the Search Warrant*

Finally, we consider the district court's finding that the officers acted with flagrant disregard of the terms of the search warrant by allowing Reffitt, their agent, to interrogate Merrill in the way she did and thereby turn the limited scope of the search warrant into an improper general search.

This basis for suppressing Merrill's blood test results necessarily requires Reffitt to have been an agent of the police over whom they had control. But, as we discussed earlier, she was not. We are left with only the separate conduct of the police to consider.

Merrill contends that the police could have advised Reffitt that Merrill did not have to answer any questions, but instead they instructed Merrill that she had no choice but to answer them. She argues that the police also "participated in gathering [evidence] by providing information to Reffitt [and] asking their own questions of Ms. Merrill." Moreover, Officer Teerink included her answers to Reffitt's questions in his police report.

Taking those contentions one at a time, the only time the police urged Merrill to cooperate with Reffitt was when Merrill told Reffitt to stop asking her questions and Teerink urged Merrill to cooperate. He later testified that he "just wanted to get that

19

process over with so [he] could get out of there." We find no contrary explanation in the record. The court has already suppressed any answers Merrill gave to Reffitt's questions.

With regard to the claim that the police provided information to Reffitt and asked their own questions of Merrill, we find nothing in the record that any police officer asked Merrill any questions while Reffitt was present and asking her screening questions. Officer Shields did tell Reffitt that Merrill hit multiple cars when Reffitt asked Merrill how fast she had been going. And when Reffitt asked Merrill whether the air bag deployed, Shields volunteered that it had. But Shields did not assist Reffitt in any way in formulating her screening questions to Merrill.

When law enforcement officers grossly exceed the scope of a search warrant in seizing physical evidence, the Fourth Amendment's particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant. *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988). Unless there is a flagrant disregard for the terms of the warrant, only the improperly seized evidence, rather than all the evidence, will be suppressed. *State v. Kleypas*, 272 Kan. 894, 930, 40 P.3d 139 (2001).

As stated in *Medlin*, the search warrant relates to the seizure of physical evidence. Here, the police obtained Merrill's blood sample as called for in the search warrant. They also heard incriminating statements she made during the course of the search. The cases we have seen relate to the seizure of things beyond those identified in the search warrant. Merrill does not cite in her appellate brief any case in which the court used the Fourth Amendment exclusionary rule to bar the thing lawfully seized pursuant to a lawful search warrant on the grounds that, during the course of the search, the police overheard incriminating non-*Mirandized* statements of the defendant, particularly when those statements have already been suppressed under the Fifth Amendment.

20

In *Medlin* the court found flagrant disregard when a local police officer, assisting a federal agency in executing a search warrant at the defendant's home, collected a vast amount of evidence not covered in the warrant without interference from the federal agency. In *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978), the court found flagrant disregard when law enforcement officers obtained a search warrant for defendant's home in order to find marijuana evidence but seized far more evidence of a larger cocaine conspiracy, which was the subject of a previous warrant the court explicitly rejected.

The exclusionary rule was created to deter flagrant police misconduct. *Weeks v. United States*, 232 U.S. 383, 393-94, 34 S. Ct. 341, 58 L. Ed. 652 (1914). It is designed to deter conduct which exhibits "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendments rights." *Davis v. United States*, 564 U.S. 229, 238, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). There was no violation of Merrill's Fourth Amendment rights here. Merrill does not question the validity of the search warrant. The police followed the edicts of the search warrant and seized the blood sample called for in the warrant. Merrill's Fifth Amendment claims relating to her statements have already been cured by the suppression of the incriminating statements she made.

The police did not flagrantly disregard the terms in the search warrant so as to engage in an impermissible general search. Neither officer nor anyone on the medical staff attempted to collect biological samples beyond the blood identified in the warrant. They did not physically harm or abuse Merrill or use excessive force to obtain the blood sample. They did not seize any item not covered by the warrant.

When the officers took Merrill to the hospital to have her blood drawn, they thought the medical staff had to ask these questions of Merrill so they could ensure that she was medically cleared for the blood draw. See K.S.A. 2016 Supp. 8-1001(e). They had seen this type of medical screening before. The officers were operating under the

21

impression that they would not be able to execute the valid warrant if the medical staff could not get through their screening questions with Merrill.

We find no evidence that the officers or Reffitt acted in flagrant disregard of the terms of the search warrant such that a blanket suppression was warranted. Because the substantial competent evidence in the record does not support such a finding, the district court erred in finding that they acted flagrantly and ordering the suppression of the blood test results.

Reversed and remanded.